**UNITED STATES of America**

**v.**

**Moshood ALATISHE, Patricia Webster, James F. Wood and Charles Kelly.**

**Crim. No. 85–0215.**

United States District Court, District of Columbia.

Aug. 28, 1985.

Barry M. Tapp, Asst. U.S. Atty., Washington, D.C., for prosecution.

Charles W. Halleck, Washington, D.C., for defendant Moshood Alatishe.

William Francis Xavier Becker, Rockville, Md., for defendant Patricia Webster.

Arthur M. Levin, Washington, D.C., for defendant Charles Kelly.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

Presently pending before this Court are two motions to suppress [1] evidence against three criminal defendants. On May 23, 1985 two units of the United States Park Police Narcotics Task Force executed search warrants at 221 R Street and 233 Florida Avenue. The search warrants had been issued by Superior Court judges for alleged violations of 33 D.C.Code § 541, the District of Columbia Uniform Controlled Substances Act of 1981. During a search of the R Street residence of defendant Alatishe, the Park Police found "a quantity of brown powder, suspected heroin, approx. 8 oz.," certain unregistered firearms, and a sum of money. The search of the Florida Avenue apartment apparently uncovered heroin.

Defendants' motion rests on two theories. First, they argue that the Park Police have no authority outside the national parks and that search warrants under the D.C. Uniformed Controlled Substances Act may lawfully be issued only to Metropolitan Police Officers. Second, they claim that the search was improper because the Park Police failed to comply with the requirements of 18 U.S.C. § 3109, the knock-and-announce statute.[2] The government opposes these motions, arguing that the

1. Defendant Moshood Alatishe filed a written motion to suppress evidence seized by the Park Police executing a search warrant. At a status call in this case, defendants Webster and Kelly moved to adopt the arguments made by Alatishe. Although it was not entirely clear at that status call that these "adoptions" were meant as motions to suppress evidence found at a different residence in a different search, the government presented evidence relating to both searches at the hearing on the motion and did not object to this Court considering the motions on the two separate incidents. Defendant Webster also filed a motion to suppress statements allegedly made to Park Police officers in violation of defendant's Sixth Amendment right to counsel. The government disputes defendant's characterization of the facts. At the hearing on motions to suppress, defendant failed to produce any evidence with respect to this motion and it will accordingly be denied.

2. This section states:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authori-

Park Police do have authority to enforce local and federal law throughout the District, that even if the warrant was technically defective suppression is not required under the good faith exception to the warrant requirement, and that the officers complied with section 3109.

## I

In the last two years, the Park Police has established a Narcotics Task Force which enforces federal and local drug laws throughout the District of Columbia. This task force apparently operates without any coordination with the Metropolitan Police. For example, there was testimony in this case that the Metropolitan Police had an ongoing investigation of the same defendants and was somewhat surprised to discover that the Park Police had conducted a drug raid.[3]

Moreover, whether due to inadequate training or excessive zeal, the Park Police has made a rather sorry show of this investigation and of a previous case recently before this Court.[4] The facts of this case are egregious also in that, as noted below, they resulted in an unwarranted three-month detention without bond for defendant Alatishe.

The Park Police discovered a quantity of powder at the Alatishe residence. A member of that police force testified that he field-tested the powder and that it tested positive for the presence of a controlled substance. Indeed, his field test was said to have revealed that the heroin concentration in the powder was particularly high. On the basis of that finding, the defendant was charged with possession with intent to distribute heroin. Again, based apparently on the results of the field test, Park Police officers testified at the initial bail hearing that the substance was heroin of an extremely high purity with a street value of $450,000, and the U.S. Magistrate thereupon ordered defendant to be held without bond pending appeal. That determination was reversed by Chief Judge Aubrey Robinson but was then reinstated by the U.S. Court of Appeals. *United States v. Alatishe,* 768 F.2d 364 (D.C.Cir.1985).

On July 13, 1985, the Drug Enforcement Agency completed its testing of the powder in question, and it determined *that there were no controlled substances whatever* in the powder, whether heroin or otherwise. These results were not transmitted to the U.S. Attorney until August 14, 1985 apparently because of a typing backlog at the DEA.[5] The Court was finally informed of these results on August 22, 1985, at which time it ordered defendant Alatishe released on his own recognizance.

At the hearing on the motion to suppress, the Park Police officers could offer no explanation of how they could have field-tested a powder as having a very high concentration of heroin when it contained no trace of a controlled substance. Whatever the explanation, defendant Alatishe was incarcerated for three months based upon erroneous Park Police testimony.

## II

The Court will consider first defendants' motion based on the theory that the Superior Court lacks the authority to issue search warrants to the Park Police for violations of local drug laws. In this respect, defend-

ty and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

3. A newspaper reporter and two television camera crews were present at the raid.

4. The trial of United States v. Thomas Pryor and Diane Jones was marked by a distressing lack of familiarity on the part of the Park Police of fundamental principles of evidence, including the requirements of chain of custody.

5. DEA officials have expressed concern over this incident and they have assured the Court that they will take steps to make certain that this kind of delay in reporting results will not happen again.

ants advance two separate but related arguments. First, they argue that the jurisdiction of the Park Police is limited to the roads, parks, parkways, and other federal reservations within (and without) the District of Columbia, but that this jurisdiction does not extend to purely residential areas in the District. Second, defendants rely upon the fact that the D.C. Uniformed Controlled Substances Act contains a specific search warrant provision which directs that search warrants be issued to the Chief of Police of the District of Columbia or any member of the Metropolitan Police Department, no mention being made of directing such warrants to the Park Police.

The legislative history available to determine the authority of the Park Police in the District of Columbia is both limited and obscure. In 1876, Congress enacted a law which provided that the duties and the authority of the Metropolitan Police "shall extend to and include all public squares or places; and [the board of the metropolitan police] is hereby authorized and required to make appropriate rules and regulations in relation thereto." Act of July 31, 1876, 19 Stat 102, Ch. 246. Six years later, legislation was enacted relating to "watchmen" in the District of Columbia (later renamed Park Police), which provided that "hereafter all watchmen provided for by the United States Government for service in any of the public squares and reservations in the District of Columbia shall have and perform the same powers and duties as the Metropolitan police of said District." Act of August 5, 1882, 22 Stat. 219, Ch. 389, presently codified at 4 D.C.Code § 201 (1981).

The first interpretation of this statute appears to be a letter by the Attorney General dated July 30, 1886, 18 Op.Atty. Gen. 433. This letter states:

> The powers and duties of the metropolitan police are conferred upon these watchmen by the act itself, without the intervention of any appointment from the commissioners of the District. The legislative purpose was to invest these watchmen with the powers and duties of the metropolitan police without connecting them with that organization.
>
> One of these watchmen has the same authority for arresting offenders and turning them over to the courts for trial that a metropolitan policeman would have who was detailed to perform a watchman's duties.

A number of subsequent statements lend credence to the claim that the Park Police have concurrent authority with the Metropolitan Police. In 1924, Congress gave the Director of the National Park Service the authority to appoint special policemen whose jurisdiction was limited to the parks; however, that jurisdiction was explicitly distinguished from the jurisdiction of the Park Police.[6]

In 1948, Congress expanded the jurisdiction of the Park Police to cover federal lands outside the District of Columbia but in the immediate environs. The Senate report incorporated a letter from the Secretary of the Interior which expressed the view that the Park Police had since 1882 exercised in the District the same powers and authority as the Metropolitan Police. Act of March 17, 1948, 62 Stat. 81, Ch. 136, 1948 U.S.Code Cong. & Admin.News 81; Senate Report 929, *id.* at 1158.

In 1976, Congress passed yet another piece of legislation dealing with the administration of the National Park System. National Park System Improvement in Administration Act, 90 Stat. 1939, Pub.L. 94–458 (Oct. 7, 1976). This law granted authority

6. The statute states:

> such special policemen to have the same powers and perform the same duties as the United States Park Police and the Metropolitan Police of said District of Columbia, ...: *Provided,* that the jurisdiction and the police power of such special policemen shall be restricted to the public parks and other reservations under the control of the Director of the National Park Service.

Act of May 27, 1924, 43 Stat. 176, Ch. 199, codified at 4 D.C.Code § 205.

to the Secretary of the Interior to designate officers to maintain law and order in areas of the National Parks, and the authority to arrest and to execute warrants was thereby strictly limited to offenses occurring in the National Park System and to arrests of persons fleeing that system. The legislative history of that law includes a letter from the Assistant Secretary of the Interior which once again explains the relationship of this legislation to the present authority of the Park Police. That letter states:

> This bill would not affect the functions or authorities of the United States Park Police, whose law enforcement mission has been defined by the Act of March 17, 1948, as amended (62 Stat. 81). Presently the Park Police are authorized to arrest for Federal offenses committed in the District of Columbia and on Federal reservations in its metropolitan area.

H. Report 94–1569, 1976 U.S.Code Cong. & Admin.News 4290, 4303–04.

While these snippets of legislative history are not unambiguous, they do indicate a congressional acquiesence in Park Police claims of concurrent jurisdiction with the Metropolitan Police Department within the District of Columbia.

There is some indication that section 739 of the District of Columbia Self-Government and Governmental Reorganization Act may have been designed to change this long-standing practice and to limit Park Police authority to that area of the District now defined as the National Capital Service Area.[7]

Nevertheless, while the question is not entirely free from doubt, the Court concludes that the Park Police is authorized to operate in the District of Columbia outside of the parks themselves. Given the growth of local autonomy, the greater expertise of the Metropolitan Police Department with respect to "common law" crimes, and the confusion that is almost inevitable when two different police forces operate in the same area with respect to the same criminal activity (see p. 3, *supra*), Congress may wish to withdraw or more specifically define this grant of authority. However, it does not appear that Congress has done so thus far, and the Court therefore concludes that the Park Police officers were not without their lawful jurisdiction when they made arrests on R Street and on Florida Avenue, N.W., in the District of Columbia.

## III

The second part of defendants' "jurisdictional" argument is that regardless of the Park Police authority generally in the District of Columbia, members of that organization do not have the power to execute search warrants based upon the D.C. Uniform Controlled Substances Act. That Act contains a special search warrant provision (D.C.Code § 33–565) which states that if a Superior Court judge is satisfied of the grounds of the application for a warrant or that there is probable cause to believe their existence, he must issue it "to the Chief of Police of the District of Columbia or any member of the Metropolitan Police Department...." No mention is made of the Park Police; yet, as noted above, the warrants utilized in these cases were issued to that police force by a Superior Court judge.

Section 565 differs sharply from the general search warrant provisions of the Code (D.C.Code § 23–521) which state that a search warrant may be addressed to a specific law enforcement officer or to any classification of the Metropolitan Police Department of the District of Columbia "or other agency authorized to make arrests or execute process in the District of Colum-

7. This section directs the President to submit to Congress a report on the advisability of combining the Executive Protective Service and the U.S. Park Police under the National Capital Service Area Director. No such report was made and no further congressional action was forthcoming on this issue.

bia." Similarly, D.C.Code § 23–501 defines "law enforcement officer" to mean "an officer or member of the Metropolitan Police Department of the District of Columbia or of any other police force operating in the District of Columbia or an investigative officer or agent of the United States." Defendants' motion thus presents the question whether in these circumstances the more specific warrant requirements of the D.C. narcotics law should be regarded as limiting the authority of Superior Court judges and require the issuance of a search warrant *only* to the Metropolitan Police.

Where there is a specific statute relating to the issuance and execution of search warrants, that particular statute as a general matter controls over any more diffuse search warrant legislation or policy. *United States v. Gooding,* 477 F.2d 428, 431 (D.C.Cir.1973), *aff'd, Gooding v. United States,* 416 U.S. 430, 94 S.Ct. 1780, 40 L.Ed.2d 250 (1974). However, that is not necessarily so in all circumstances. Indeed, in *Gooding,* the Supreme Court construed the federal search warrant statute to permit Metropolitan Police Department officers to execute federal search warrants even though the governing statute lacked specific language authorizing the issuance of such warrants to that Department. The Court reasoned that

> [t]he failure of Congress to include a special provision authorizing District of Columbia police officers to obtain search warrants for investigating federal offenses cannot be taken as a deliberate exclusion in view of the overall statutory framework. The provision included in the previous federal statute may well have seemed unnecessary, both in light of the history of cooperation between the District of Columbia police and federal officers and in view of the provisions of D.C.Code § 4–138 providing that "any warrant for search or arrest, issued by any magistrate of the District, may be executed in any part of the District by any member of the police force." Thus, custom and statute already assured the availability of District of Columbia police. Furthermore, the legislative history relating to § 879(a) stresses the need for stronger enforcement of federal narcotics laws, a goal hardly advanced by reducing the forces available to execute those laws.

*Gooding v. United States, supra,* 416 U.S. at 449, 94 S.Ct. at 1790.

Similar considerations govern in this case. The special warrant provisions of the D.C.Code were originally enacted in 1956 as part of the Dangerous Drug Control Act for the District of Columbia.[8] The basic purpose of the statute was to provide additional tools in the fight against the illegal drug traffic, and there is no indication in the legislative history that the warrant provisions were intended to limit the class of law enforcement officers eligible to apply for warrants. To the contrary; the statute appears to have constituted an attempt to remedy the then-prevailing practice that all warrants had to be executed by federal officers.

The House Report accompanying the Act reprints portions of a Senate Judiciary Committee report on "Illicit Narcotics Problems in the District of Columbia." One of the problems detailed by the Senate Report was the local police officers' lack of authority to serve search warrants for violations of federal narcotics laws. The report states:

> Narcotics cases in the District of Columbia are generally prosecuted under the Harrison Narcotic Act, the Export-Import Act, and the Marihuana Tax Act. Since these are Federal statutes, warrants issued based on a violation of such statutes must be directed to the United States marshal or to some civil officer of

8. Act of July 24, 1956, 70 Stat. 620, Ch. 676, Pub.L. 764 *reprinted in* 1956 U.S.Code Cong. & Admin.News 705, 715.

the United States. They may not be directed to a member of the Metropolitan Police Department. The result is that it is necessary for District police officers to obtain the assistance of a United States marshal or a Federal narcotics agent to accompany him on each occasion that he has to serve a warrant for violation of one of the Federal statutes. Criticizing this procedure, United States Commissioner Lawrence testified:

"* * * If the policeman applies to me for a search warrant and he has all the information, I have to direct the search warrant to a United States marshal or to a Federal narcotic agent. While I do not say the narcotic agents do not cooperate with them, they cooperate in my opinion with the police department very well, I do not think that it should be a necessity each time to have a United States marshal who probably knows nothing about the violation to go along with them, just because it requires an official tag."

This procedure places the District police officer under a considerable handicap, in that Federal officers are not always available, and, also, it obviously must burden the United States marshal with unwanted chores. In any event, it is a waste of manpower to have 2 enforcement officers doing a job that 1 alone could do as well. Moreover, such an additional officer who must presently make the return affidavit to the acception of the search warrant unnecessarily adds another witness to the proof of continuity of possession of any narcotics seized as a result of this warrant.

H.Rep. 2277, 84th Cong., 2d Sess., July 7, 1956 at 15–16.

This portion of the statute was subsequently incorporated without significant changes into the District of Columbia Uniform Controlled Substances Act of 1981. See 28 D.C.Reg. 3081. Whatever may have been the precise legislative purpose, it does not appear that there was any affirmative intention to limit the availability of search warrants to the local police. Although the issue is not entirely clear from doubt, the Court concludes that, given the complex relationship between the District of Columbia and the federal government, the long history of cooperation in narcotics law enforcement, and the fact that Superior Court judges are generally authorized to issue search warrants to federal officials,[9] the warrant was not invalidly issued.

Finally, even if the Court were to conclude that the jurisdiction of the Park Police was limited or that Superior Court judges are not authorized to issue narcotics warrants to anyone other than the Metropolitan Police, the fruits of the search would not necessarily have to be excluded. See *United States v. Leon,* — U.S. —, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), where the Supreme Court upheld a search under a defective warrant because the officers were acting in good faith in reliance on that warrant.

For these reasons, the Court rejects the arguments of defendants on the suppression issue based on the alleged lack of authority of the Park Police or of the Superior Court.

## IV

The issue of suppression will therefore turn upon the factual question whether the Park Police officers complied with the provisions of the knock-and-announce statute, 18 U.S.C. § 3109. See *supra* note 2. Since two separate premises were searched, and the factual background is different for each, it is necessary to make a separate decision with respect to each premises.

### A. *221 R Street*

Defendant Alatishe moved to suppress evidence seized from 221 R Street.

9. Federal Rule of Criminal Procedure 41 authorizes state court judges to issue federal warrants. The general search warrant authority of the D.C.Code also authorizes Superior Court judges to issue warrants to federal officers. 23 D.C.Code § 521.

Two police officers testified on behalf of the government. According to their testimony, there was both an outer door with a metal grill and an inner door; one officer duly knocked loudly on each door and announced that the police were present; and the same officer loudly demanded entry for the purpose of executing a search warrant. After a period of 45 seconds to one minute had elapsed at each door, the police broke open the particular door and entered the residence. If true, this testimony would demonstrate compliance with the statute.[10]

There was, however, sharply conflicting testimony. Two men, Tobbey Alatishe and John Shipman, who occupied a room on the first floor of the premises, testified, without contradiction or impeachment, that they had heard no knock or announcement. To the contrary, the only sounds they heard prior to the crash of doors breaking in, were noises emanating from walkie-talkies. Thus, without more, there would be a stand-off of testimony, with an edge to the officers because of their presumed disinterestedness.

In this case, unlike in most others, there is an additional piece of evidence on this issue. Immediately after conducting the raid, Lt. Irwin of the Park Police gave an interview to the *Washington Post* in which he is quoted as stating, " 'We got in there so fast that no one had a chance to do anything' said Park Police Lt. Hugh Irwin, who participated in one of the raids. 'We ripped off the barred door, popped the second door and ran in.' " Defendant's Exhibit 1. This description of the Park Police's actions corresponds more closely to the version detailed by Tobbey Alatishe and John Shipman than that given in Court by Lt. Irwin and Officer Kass. The credibility of the Park Police officers' testimony is further undermined by the problems detailed above relating to the field testing for drugs.

Based upon the evidence contradicting the Park Police testimony and this Court's judgment as to credibility, the Court concludes that the Park Police did not comply with section 3109, and the evidence seized will accordingly be suppressed.

B. *233 Florida Avenue*

The situation is different with respect to the search of the Florida Avenue residence. Officer DeAngelo testified that he used force to break the glass on the front door of the apartment building[11] and entered the common area. His unit thereupon went to Apartment 3 on the second floor where the officer knocked loudly, announced his identity and purpose. After 30 seconds when there was no response, he again knocked and announced his purpose. Approximately 15 seconds after the second announcement, the Park Police broke into the apartment.

While the exact applicability of section 3109 to outside doorways is not fully established (*United States v. Fluker,* 543 F.2d 709 (D.D.C.1976)), the circumstances in this case, in which the outside doorway gave entry into a common hallway some distance from the apartment, do not give rise to a violation of section 3109 because of the officer's failure to knock and announce at the outer door. See *United States v. Perkins,* 286 F.Supp. 259 (D.D.C. 1968), *aff'd,* 432 F.2d 612 (D.C.Cir.1970) (per curiam). The Court finds credible Officer DeAngelo's testimony that he did knock and announce when confronted with the apartment door, particularly since de-

10. The Court notes that the Alatishe residence apparently has a doorbell/intercom system which the U.S. Park Police made no effort to utilize. The statute requires the police to give notice of their authority and purpose and it appears to the Court that the most effective form of notice in many buildings would be through use of such a buzzer system in addition to knocking on the door. In view of the Court's determination that the police did not comply with section 3109, the Court need not determine whether in some circumstances failure to utilize a more effective means of notice could violate section 3109's mandate. See, *e.g., United States v. Fluker,* 543 F.2d 709, 715 (9th Cir.1976).

11. There was no buzzer or doorbell on the outside of the apartment building.

fendants produced no evidence to impeach or contradict his testimony. Accordingly, the Court will deny the motions to suppress of defendants Webster and Kelly.