James J. RICHARDSON, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 85–1237.

District of Columbia Court of Appeals.

Argued July 3, 1986.
Decided Jan. 28, 1987.

George Denney, Washington, D.C., appointed by this court, for appellant.

Robert MacNair Morgan, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Judith Hetherton, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, and BELSON and TERRY, Associate Judges.

BELSON, Associate Judge:

Richardson was convicted of possession of dilaudid, a controlled substance, D.C. Code § 33–541(d) (1986 Supp.). On appeal, he argues that the trial court erred in denying his motion to supress evidence. He first asserts that the United States Park Police officers who arrested him lacked the authority to do so because the arrest took place outside of any federal park or reservation, and that the evidence they seized should therefore be suppressed. Second, he argues that the trial court erred in finding that his seizure by the officers occurred only after he had thrown into the street a pill box which contained the dilaudid tablets. We hold that United States Park Police officers have jurisdiction to make arrests anywhere in the District of Columbia. We also hold that the officers seized appellant only after he had discarded incriminating evidence and attempted to flee, thereby furnishing specific and articulable facts justifying the seizure. We therefore affirm.

The facts relevant to this appeal were developed in a hearing held on Richardson's motion to suppress evidence. The only witness was Officer John Harasek of the United States Park Police's Narcotics Enforcement Unit. He testified that in the early evening of March 25, 1985, he was on routine patrol with Detective Ronald Schmidt and Sergeant Billy Zeh. The officers were in plain clothes and were driving an unmarked car. As they were driving north on 11th Street, N.W., they passed a club known as the "Ballpark Club." Harasek said he knew the club to be a place where drugs were sold. As they drove past the club, Richardson came out of the club and locked a metal door behind him. Richardson started to walk north on 11th Street and looked back at the police car. Harasek said that Richardson appeared to be nervous.

Sergeant Zeh noticed that Richardson was holding a small white object in his left hand. Richardson looked back at the police car one more time, and quickly put the object in his pocket. Harasek put the car in park, and the officers started to get out of the vehicle.

As Schmidt and Zeh were getting out of the car, they called out, in voices loud enough for Richardson to hear, "Police, wait a second. We want to talk to you." Richardson then reached into his pocket, and threw the white object into the street. Harasek immediately ran into the street to retrieve the object.

After throwing the object into the street, Richardson started to run away. Schmidt and Zeh caught up with him and the three scuffled. In the meantime, Harasek had picked up the object, which turned out to be a white Bayer aspirin pill box, opened it, and saw six pills marked "K–4," which he recognized to be dilaudid. He went back to the sidewalk to help his fellow officers subdue Richardson. The officers then arrested Richardson.

Prior to trial, Richardson moved to suppress the drugs, arguing that the Park Police were outside of their jurisdiction when they arrested him, that they lacked articulable suspicion to justify stopping him, and that they were without probable cause to arrest him. It is undisputed that there is no federal park or other federal reservation near the place of the arrest, 11th and P Streets, N.W.

In the first phase of the suppression hearing, the motions judge heard extensive arguments concerning the authority of the United States Park Police to make arrests outside of the parks or federal reservations within the District of Columbia. The court

ruled that Park Police officers have that authority.

In the second phase of the suppression hearing, Officer Harasek testified concerning the facts surrounding the arrest of appellant. Thereafter, the court entertained argument from counsel. Richardson argued that the police "seized" him at the moment they got out of their car, and that they did not have specific and articulable facts which justified that seizure. *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). The government argued that the police merely approached Richardson to ask questions, and that they did not need articulable suspicion to do so.

After a lengthy colloquy with counsel, the trial court denied Richardson's motion to suppress, stating: "And the way I read the law, the cops could ask him to stop and could talk to him. And I find that that's exactly what they did."

### I.

We first address Richardson's argument that Park Police officers lack jurisdiction to make arrests outside of parks and other federal reservations. We agree with the trial court that United States Park Police officers have jurisdiction to make arrests anywhere in the District of Columbia. Therefore, we reject Richardson's argument that the evidence seized must be suppressed because of the arresting officer's lack of authority to effect a legal arrest.

The question of Park Police arrest jurisdiction has been examined recently by Judge Harold H. Greene of the United States District Court for the District of Columbia in *United States v. Alatishe,* 616 F.Supp. 1406 (D.D.C.1985). Judge Greene concluded that Park Police officers have city-wide jurisdiction. *Id.* at 1410. Our reading of the statutes and legislative history, and our interpretation of Congress' reaction to information placed before it, lead us to conclude, as did the trial court and Judge Greene, that United States Park Police officers are authorized to make arrests anywhere in the District of Columbia.

Congress created the United States Park Police in 1882 by the adoption of statutory language that, as amended, remains a part of the District of Columbia Code today. The original enactment read:

> That hereafter all watchmen provided for by the United States Government for service in any of the public squares and reservations in the District of Columbia shall have and perform the same powers and duties as the Metropolitan police of said District.

Act of August 5, 1882, ch. 389, 22 Stat. 219, 243 (codified as amended at D.C.Code § 4–201 (1981)).[1]

This enactment can be interpreted as establishing a special force of watchmen, since renamed Park Police, created for the particular purpose of policing public squares and reservations, but whose members have and perform throughout the District of Columbia the same powers and duties as the Metropolitan police. This interpretation is quite plausible because there are no words of limitation in the statutory language that grants authority. The statutory language can also be interpreted, however, to provide that the police force it creates will have the same powers and duties as the Metropolitan police, but may exercise them only in the public squares and reservations of the District of Columbia.

The proper interpretation of the laws defining the powers of the Park Police was clarified when, in 1924, Congress adopted legislation placing the Director of the National Park Service in charge of the Park Police and authorizing him to appoint "spe-

---

1. In 1919, Congress renamed the watchmen "United States Park Police," as follows:

   That the watchmen provided by the United States Government for service in any of the public squares and reservations in the District of Columbia shall hereafter be known as the "United States park police".... 

   Act of December 5, 1919, ch. 1, § 3, 41 Stat. 363, 364 (codified as amended at D.C. Code § 4–201 (1981)).

cial policemen" for the federal reservations in the District. That legislation provided:

That the officer in charge of public buildings and grounds, in his discretion, may appoint special policemen, without compensation, for duty in connection with the policing of the public parks and other reservations under his jurisdiction within the District of Columbia, such special policemen to have the same powers and perform the same duties as the United States park police and the Metropolitan police of said District of Columbia, and to be subject to such regulations as the chief of engineers may prescribe: *Provided,* That the jurisdiction and police power of such special policemen shall be restricted to the public parks and other reservations under the control of [the Director of the National Park Service].

Act of May 27, 1924, ch. 199, §§ 4, 9, 43 Stat. 174, 175–76 (codified as amended at D.C.Code §§ 4–202, –205 (1981)).

We conclude that the 1924 amendment reflects the view of Congress that the Park Police and the Metropolitan police have equal jurisdiction. If Park Police officers' arrest powers had already been limited to the parks, there would have been no need for Congress to include the proviso so limiting the jurisdiction of the special policemen.

We draw additional support for our conclusion that the Park Police have city-wide jurisdiction from the fact that Congress has not amended the statute over the past 60 years, even though on at least two occasions it was explicitly informed that the Park Police asserted and exercised jurisdiction throughout the District of Columbia. In 1948, Congress extended the jurisdiction of the Park Police to federal reservations in the District's environs.[2] Act of March 17, 1948, ch. 136, § 1, 62 Stat. 81, 81 (codified as amended at D.C.Code § 4–206 (1981)). The House and Senate reports incorporated a letter by the Secretary of the

Interior who, without reference to any geographical limitations, stated that Park Police officers had, since 1882, exercised the same powers and authority as the Metropolitan police. H.R. REP. No. 1299, 80th Cong., 2d Sess. 2–3, *reprinted in* 1948 U.S. CODE CONG. & AD.NEWS 1158, 1159–60; S.REP. No. 929, 80th Cong., 2d Sess. (1948).

In 1976, Congress authorized law enforcement personnel within the National Park system to maintain law and order in the National Parks by investigating and executing warrants for offenses occurring within the National Parks and by arresting persons inside or fleeing from the National Park system. Act of October 7, 1976, Pub.L. No. 94–458; § 2, 90 Stat. 1939, 1941 (codified at 16 U.S.C. § 1a–6(a)). The House Report incorporated a letter from the Assistant Secretary of the Interior which stated in part:

This bill would not affect the functions or authorities of the United States Park Police, whose law enforcement mission has been defined by the Act of March 17, 1948, as amended (62 Stat. 81). Presently the Park Police are authorized to arrest for Federal offenses committed in the District of Columbia and on Federal reservations in its metropolitan area. This special authority of the Park Police is adequate for them to perform their responsibilities, and we do not believe there is a need to alter that authority in this bill.

H.R.REP. No. 1569, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. CODE CONG. & AD. NEWS 4290, 4303–4304; *see also* S.REP. No. 1190, 94th Cong., 2d Sess. (1976). Neither in 1948 nor in 1976 did Congress amend the original act, even though it was informed that the Department of the Interior took the position that Park Police officers were authorized to make arrests anywhere in the District.

We recognize that "[n]onaction by Congress is not often a useful guide," but that

---

2. The environs include Arlington, Fairfax, Loudoun, Prince William, and Stafford Counties, and the City of Alexandria in Virginia, and Prince George's, Charles, Anne Arundel, and Montgomery Counties in Maryland. D.C.Code § 4–208 (1981).

in some instances Congressional nonaction can be "significant." *Bob Jones University v. United States*, 461 U.S. 574, 600, 103 S.Ct. 2017, 2033, 76 L.Ed.2d 157 (1983). Considering the circumstances that bear on the interpretation of the statute before us, we note that here we have at least two instances, over a period of almost forty years, in which the question of the Park Police's jurisdiction was explicitly brought to the Congress' attention. Despite this fact, Congress left intact the original statutory language and the practice that had arisen under that language. Although we do not deem the Congressional inaction here conclusive, we are satisfied that some significance can be given to the fact that Congress, although aware of the Interior Department's position, has not acted to limit the city-wide jurisdiction claimed and exercised by the Park Police.

Having considered the original statutory language, the relevant amendments, and the pertinent legislative history, we conclude that Park Police officers have jurisdiction to make arrests anywhere in the District of Columbia. Accordingly, we reject Richardson's argument that the Park Police officers arrested him illegally because they were outside of their jurisdiction.[3]

We turn, then, to a discussion of Richardson's claim that the arrest violated his Fourth Amendment rights.

## II.

The question whether police have seized an individual is resolved in the first instance by the trial court. Since such a determination is a question of law, however, we must review independently the trial court's conclusion, giving due deference to the trial court's findings of fact concerning appellant's encounter with the

police. *United States v. Gayden*, 492 A.2d 868, 872 (D.C.1985).

■ The touchstone regarding whether a person has been "seized" within the meaning of the Fourth Amendment is whether a reasonable person would have felt free to leave. *E.g., Lawrence v. United States*, 509 A.2d 614, 616 n. 2 (D.C.1986) (citing *Florida v. Royer*, 460 U.S. 491, 501–02, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion)). Law enforcement officers do not violate the Fourth Amendment merely by approaching an individual on the street or in another public place and asking a few questions. *Florida v. Royer*, 460 U.S. at 497, 103 S.Ct. at 1324. "Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification." *Id.* Therefore, where, as here, a police officer approaches an individual on the street, identifies himself as a police officer, and asks the individual a few questions, a seizure has not occurred for Fourth Amendment purposes. *See United States v. Barnes*, 496 A.2d 1040 (D.C.1985).

The trial court found no Fourth Amendment seizure in this case. It is true that the court's finding, "And the way I read the law, the cops could talk to him. And I find that that's exactly what they did ..." is somewhat conclusory. The court did not explicitly say that the police officers approached Richardson merely to ask questions without detaining him, nor did the court make explicit findings regarding the circumstances surrounding the approach. *See* note 5, *infra*. We are able, however, to confirm from other comments that the court found that the police had not seized Richardson when he threw the pill box into the street.[4]

---

**3.** In view of this disposition, we do not reach the question whether the exclusionary rule would apply if the Park Police had acted without authority.

**4.** For instance, the court commented, "The only thing you [the government] can give me in the facts in this case are a few furtive looks over his

shoulder." We interpret this and other comments to mean that had the court found that the officers seized Richardson when they alighted from their car, he would have suppressed the drugs for lack of specific and articulable facts justifying the seizure. The fact that the court commented that the police could approach a

The evidence before the court showed that the officers pulled up next to Richardson, and said to him "Police, wait a second. We want to talk to you." On comparable facts, we held that an officer did not seize the defendant when he approached him, asked him to remove his hands from his pockets and asked, "What are you doing here?" and "Have you ever been arrested?" *Barnes, supra,* 496 A.2d at 1042–45. Nor did we find it to be a seizure when a police officer tapped on the window of a parked car and asked its occupant to show the officer some identification. *Purce v. United States,* 482 A.2d 772, 777 (D.C. 1984). *See also United States v. Burrell,* 286 A.2d 845, 846 (D.C.1972) (no seizure when officer approached defendant, touched his arm and said, "Hold it, sir, could I speak with you a second?").

 Moreover, there was no showing that the officers used physical force or otherwise made a showing of authority before Richardson discarded the pill box and attempted to flee. Neither of the officers touched appellant or drew a gun. Nor is there any indication that the officers used threatening language or a commanding tone. In short, the record reflects no indications of intimidating circumstances such as those described by the Supreme Court in *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion).[5]

We conclude that there was no seizure before Richardson discarded the pill box, and that once Richardson threw the box into the street and tried to flee, the police had specific and articulable facts justifying a *Terry* stop. *See Lawrence, supra,* 509 A.2d at 616 (flight from authority may be considered among other factors justifying a *Terry* seizure) (citing cases). We affirm the trial court's denial of Richardson's motion to suppress on this ground.

*Affirmed.*

---

person to ask questions, and found, "that that's exactly what they did," when considered in light of other comments such as the one set out above, leads us to conclude that the court found that the police did not seize Richardson when they got out of their car and called to him to stop.

5. The trial judge preferably should make findings with respect to the surrounding circumstances, such as the officers' tone of voice, demeanor, and actions, so as to facilitate appellate review. *See Murville v. Murville,* 433 A.2d 1106, 1109 (D.C.1981) (trial court must make sufficient findings to enable meaningful review).