UNITED STATES, Appellant,

v.

John EDELEN, Appellee.

No. 86–110.

District of Columbia Court of Appeals.

Argued Oct. 30, 1986.

Decided July 27, 1987.

Saul M. Pilchen, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Robert M. Morgan, and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

William J. Garber, Washington, D.C., for appellee.

Before MACK, FERREN and ROGERS, Associate Judges.

MACK, Associate Judge:

This appeal by the United States challenges a trial court order granting appellee's motion to suppress certain tangible evidence seized by the United States Park Police during the execution of a search warrant at appellee's home. The trial court invalidated the warrant after concluding that under local law, narcotics search warrants cannot be issued to the Park Police, but only to the "Chief of Police of the District of Columbia or any member of the Metropolitan Police Department." D.C. Code § 33–565(e) (1986 Supp.). The trial court further concluded that the "good faith" exception to the suppression of unlawfully seized evidence was inapplicable. We agree that the Park Police lacked statutory authority to be issued the warrant. We find, however, that the rule first announced in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and later amplified in *Illinois v. Krull,* —— U.S. ——, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), compels that we vacate the order of suppression and remand with directions that a hearing be held to determine whether the Park Police reliance on the warrant was "objectively reasonable."

On February 20, 1985, Detective Ronald K. Schmidt, a member of the United States Park Police, applied for and obtained a search warrant authorizing the seizure of narcotics and narcotics-related paraphernalia from appellee's home in northwest Washington. The alleged ground for the seizure was "violation of U.S. and/or D.C. Laws." The warrant, issued by a judge of the Superior Court of the District of Columbia, was directed to the "Chief, United States Park Police or any other authorized law enforcement officer."

During the evening of February 22, 1985, some six Park Police officers executed the warrant together with at least two other warrants authorizing searches in the same building in which appellee lived. A copy of the warrant with the return listing the inventory was subsequently filed in Superior Court on February 25. Officers from the Metropolitan Police Department took no role in the application for, nor execution of, the warrant.

Appellee was not home at the time of the search. On the basis of the seizure of seven syringes and a number of valium tablets, he was subsequently arrested. He was charged under District of Columbia law with possession of a controlled substance, D.C.Code § 33–541(d) (1986 Supp.), and possession of narcotics paraphernalia, *id.* § 33–603(b).

At the hearing on appellee's motion to suppress, appellee first argued that the geographical jurisdiction of the United States Park Police was strictly limited to the National Park system. The trial court properly rejected this argument. *Richardson v. United States,* 520 A.2d 692 (D.C. 1987). Appellee then argued that regardless of the scope of the general jurisdiction of the Park Police, its officers are specifically prohibited from executing narcotics search warrants under D.C.Code § 33–565 (1986 Supp.), and, under those circumstances, the "good faith" exception does not apply. *See Leon, supra,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677. On the basis of those arguments, the motions judge granted appellee's motion.

I.

In 1981, the Council of the District of Columbia passed the Uniform Controlled Substances Act. D.C.Law 4–29, 28 D.C. Reg. 3081 (1981) (codified at D.C.Code §§ 33–501 through –567 (1986 Supp.)) (hereinafter "CSA"). The primary goal of the CSA was "to create a comprehensive system governing the use of controlled substances" by revamping the existing District

law. COMMITTEE ON THE JUDICIARY OF THE COUNCIL OF THE DISTRICT OF COLUMBIA, REPORT ON BILL 4-123: THE "DISTRICT OF COLUMBIA UNIFORM CONTROLLED SUBSTANCES ACT OF 1981" at 1 (April 8, 1981) (hereinafter "JUDICIARY REPORT"). Prior to the enactment of the new law, the primary vehicles for regulation of controlled substances in the District were the Uniform Narcotic Drug Act (UNA) passed by Congress in 1938[1] and the Dangerous Drug Act (DDA) passed by Congress in 1956.[2] The Controlled Substances Act repealed and replaced both those laws. D.C.Law 4-29, §§ 604(a)(1) and (c), 28 D.C.Reg. 3115-16 (1981); JUDICIARY REPORT, *supra,* at 3.

Among other reforms, the CSA classified controlled substances into five schedules, sanctioned a range of penalties consistent with both the potential dangerousness of the substance and the nature of the offense, and created a closed regulatory system for the legitimate handling of controlled substances. D.C.Law 4-29, 28 D.C. Reg. 3081 (1981). As part of the miscellaneous enforcement provisions, the Act included a comprehensive search warrant provision. Codified at D.C.Code § 33-565 (1986 Supp.), the provision mandated both the substantive and procedural requirements for the issuance, execution, and return of narcotics search warrants.[3] It is

1. Pub.L. No. 75-682, ch. 532, 52 Stat. 785 (1938).

2. Pub.L. No. 84-764, ch. 676, §§ 201-214, 70 Stat. 609, 612-18 (1956) (Title II of the Dangerous Drug Control Act).

3. Section 33-565 provides:

   (a) A search warrant may be issued by any judge of the Superior Court of the District of Columbia when any controlled substances are manufactured, possessed, controlled, sold, prescribed, administered, dispensed, or compounded, in violation of the provisions of the District of Columbia Uniform Controlled Substances of Act of 1981, and any such controlled substances and any other property designed for use in connection with such unlawful manufacturing, possession, controlling, selling, prescribing, administering, dispensing, or compounding, may be seized thereunder, and shall be subject to such disposition as the Court may make thereof and such controlled substances may be taken on the warrant from any house or other place in which they are concealed.

   (b) A search warrant cannot be issued but upon probable cause supported by affidavit particularly describing the property and the place to be searched.

   (c) The judge or Magistrate must, before issuing the warrant, examine on oath the complainant and any witnesses he may produce, and require their affidavits or take their depositions in writing and cause them to be subscribed by the parties making them.

   (d) The affidavits or depositions must set forth the facts tending to establish the grounds of the application or probable cause for believing that they exist.

   (e) If the judge or Magistrate is thereupon satisfied of the existence of the grounds of the application or that there is probable cause to believe their existence, he must issue a search warrant, signed by him, to the Chief of Police of the District of Columbia or any member of the Metropolitan Police Department, stating the particular grounds of probable cause for its issue and the names of the persons whose affidavits have been taken in support thereof, and commanding him forthwith to search the place named for the property specified and to bring it before the judge or Magistrate.

   (f) A search warrant may in all cases be served by any of the officers mentioned in its direction, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution.

   (g) The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance.

   (h) The judge or Magistrate shall insert a direction in the warrant that it may be served at any time in the day or night.

   (i) A search warrant must be executed and returned to the judge or Magistrate who issued it within 10 days after its date; after the expiration of this time the warrant, unless executed, is void.

   (j) When the officer takes property under the warrant, he must give a copy of the warrant together with a receipt for the property taken (specifying it in detail) to the person from whom it was taken by him, or in whose possession it was found; or in the absence of any person, he must leave it in the place where he found the property.

   (k) The officer must forthwith return the warrant to the judge or Magistrate and deliver to him a written inventory of the property taken, made publicly or in the presence of the person from whose possession it was taken, and of the applicant for the warrant, if they are present, verified by the affidavit of the officer at the foot of the inventory and taken before the judge or Magistrate at the time, to the following in effect: "I _____, the officer by whom this warrant was executed, do swear that the above inventory contains a true and detailed account of all the property taken by me on the warrant."

that provision which is the subject of this controversy.

### A.

We turn first to a threshold issue. At oral argument, the government challenged the trial court's implicit finding that the warrant was applied for under D.C.Code § 33–565 (1986 Supp.). The government maintained that the warrant was applied for under both the local provision and the analogous federal provision, 21 U.S.C. § 879 (1982).[4] It argued that the Park Police's undisputed authority to be issued search warrants under the federal provision validated the warrant in this case. *See* FED.R.CRIM.P. 41(a) ("[a] search warrant authorized by this rule may be issued ... upon request of a federal law enforcement officer ...").

■ A Superior Court judge, of course, has jurisdiction to issue both federal and local search warrants. FED.R.CRIM.P. 41(a); D.C.Code § 23–521 (1981); D.C.Code § 33–565 (1986 Supp.). It is clear, however, that the warrant in question was issued, executed, and returned pursuant to local, not federal, law. While not dispositive, the filing of the application in the Superior Court at least suggested that the warrant in question was sought under local law. More importantly, however, the language of the warrant complied only with § 33–565 and local procedural rules. The warrant directed the executing officers to file a copy of the warrant and return with the Superior Court. D.C.Code § 33–565(i) (1986 Supp.); Super.Ct.Crim.R. 41(d)(6). If the warrant had been applied for under federal law, it would have designated a

federal magistrate to whom it should have been returned. FED.R.CRIM.P. 41(c)(1). Moreover, the executing officers in fact returned the warrant to the issuing judge in the Superior Court and not to a federal magistrate. D.C.Code § 33–565(k) (1986 Supp.); Super.Ct.Crim.R. 41(f). Again, if the warrant had been issued pursuant to federal law, the magistrate to whom the warrant was returned would have been obligated to file the papers with "the clerk of the district court for the district in which the property was seized." FED.R.CRIM.P. 41(g). Finally, appellee was charged only under local law.

The situation in this case is therefore the converse of that in *Gooding v. United States,* 416 U.S. 430, 94 S.Ct. 1780, 40 L.Ed.2d 250 (1974). In *Gooding,* officers of the Metropolitan Police Department applied for and executed a narcotics search warrant. The Supreme Court held, however, that the warrant was issued and executed pursuant to federal, not local, law. There, a federal magistrate sitting in the United States District Court building had issued the warrant, the subsequent indictment was sought in federal court, and the only charges were for violations of federal law. By like reasoning, the warrant in this case was issued pursuant to local law even though the applicants were federal officers.

### B.

■ We examine now the question whether Park Police officers can properly be issued search warrants pursuant to D.C. Code § 33–565 (1986 Supp.). Section 33–565(e) reads in relevant part:

(*l*) The judge or Magistrate must thereupon, if required, deliver a copy of the inventory to the person from whose possession the property was taken and to the applicant for the warrant.

(m) The judge or Magistrate must annex the affidavits, search warrant, return, inventory, and evidence, and at once file the same, together with a copy of the record of his proceedings, with the Clerk of the Superior Court of the District of Columbia.

(n) Whoever shall knowingly and willfully obstruct, resist, or oppose any such officer or person in serving or attempting to serve or execute any such search warrant, or shall

assault, beat, or wound any such officer or person, knowing him to be an officer or person so authorized, shall be fined not more than $1,000 or imprisoned not more than 2 years.

4. 21 U.S.C. § 879 (1982) provides:

A search warrant relating to offenses involving controlled substances may be served at any time of the day or night if the judge or United States magistrate issuing the warrant is satisfied that there is probable cause to believe that grounds exist for the warrant and for its service at such time.

If the judge or Magistrate is ... satisfied of the existence of the grounds of the application [for a search warrant] or that there is probable cause to believe their existence, *he must issue a search warrant, signed by him, to the Chief of Police of the District of Columbia or any member of the Metropolitan Police Department,* stating the particular grounds or probable cause for its issue.

*Id.* (emphasis added).

■ In interpreting this provision, we are guided by the principle that "the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain ... the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). The plain language of § 33–565(e) does not authorize issuance of narcotics search warrants to the Park Police, but rather, mandates issuance to the chief or any member of the Metropolitan Police Department. Given the jurisdictional nature of this provision, the presumption of interpretation in accordance with the plain meaning is quite high. Indeed, to include the Park Police as authorized issues would preempt the legislature's undisputed authority to delineate spheres of law enforcement power.

This interpretation is further reinforced by the distinctive language found in the general search warrant statute, D.C.Code § 23–521(e) (1981). There, Park Police officers are clearly authorized issues of search warrants:

A search warrant may be addressed to a specific law enforcement officer or to any classification of officers of the Metropolitan Police Department of the District of Columbia or *other agency authorized to make arrests or execute process in the District of Columbia.*

*Id.* (emphasis added). The distinction between this language and the language of the narcotics search warrant statute compels that we distinguish between the two for purposes of interpreting the special statute. The restrictive language of § 33–565(e) cannot be rendered meaningless. We cannot assume, in view of the language, the practice attendant to, or the policy underlying the general warrant provision, that the legislature intended to include the Park Police as authorized issues under the special warrant provision without specifically so providing. Moreover, it has long been settled that the special warrant provisions at § 33–565 control over the general warrant provisions at §§ 23–521 through –525. *United States v. Thomas,* 294 A.2d 164, 168 (D.C.), *cert. denied,* 409 U.S. 992, 93 S.Ct. 341, 34 L.Ed.2d 258 (1972).

When § 33–565(e) is read in conjunction with other provisions of § 33–565, a "plain meaning" interpretation is compelled. Under § 33–565(h), liberal nighttime searches of homes are permitted: "[t]he judge or Magistrate shall insert a direction in the warrant that it may be served at any time in the day or night." [5] While the application for the warrant must, of course, be based on probable cause to believe that contraband is located on the person or place to be searched, the statute does not require any additional showing to justify the search *at night. Hines v. United States,* 442 A.2d 146 (D.C.1982); *see Gooding, supra,* 416 U.S. at 433, 94 S.Ct. at 1783.

The approval of liberal nighttime searches in narcotics cases justifies the restriction of authorized narcotics search agents to the local police. The acknowledged experience of officers of the Metropolitan Police Department can legitimately be required given the severe intrusion upon privacy rights that nighttime searches of

**5.** As originally enacted in 1938 in the Uniform Narcotic Drug Act, the provision authorizing nighttime searches was somewhat more restrictive. Pub.L. No. 75–682, ch. 532, § 14(h), 52 Stat. 785, 793 (1938). The daytime execution of warrants was required unless information in the affidavit indicated that it was "positive" that the property was in the place to be searched. *Id.* In 1956, Congress amended the UNA to liberalize the night search provision using the exact language currently found in D.C.Code § 33–565(h) (1986 Supp.). Pub.L. No. 84–764, ch. 676, § 301(k), 70 Stat. 609, 620 (1956).

homes entails. Homes, of course, are traditionally at the core of Fourth Amendment protection. *See Payton v. New York,* 445 U.S. 573, 585–86, 100 S.Ct. 1371, 1379–80, 63 L.Ed.2d 639 (1980); *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961); *Miller v. United States,* 357 U.S. 301, 306–09, 78 S.Ct. 1190, 1194–95, 2 L.Ed.2d 1332 (1958). As Mr. Justice Harlan noted in finding a nighttime search of a private home unconstitutional in *Jones v. United States,* 357 U.S. 493, 498, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958): "[I]t is difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home." *See also Coolidge v. New Hampshire,* 403 U.S. 443, 447, 91 S.Ct. 2022, 2028, 29 L.Ed.2d 564 (1971) (nighttime entry into a private home was an "extremely serious intrusion"); *Griswold v. Connecticut,* 381 U.S. 479, 485–86, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965) (court repelled by idea of nighttime search of bedrooms for illegal contraceptives). Given the heightened intrusion created by the nighttime police search of one's home, this Court cannot sanction the *ultra vires* exercise of that power by the Park Police.[6]

The authority of the Park Police to execute nighttime warrants under the District's general warrant statute by no means compels a different result. Freedom from unwarranted nighttime searches is specifically safeguarded in § 23–522(c) of the general warrant provisions.[7] No such safeguards exist in § 33–565.

Furthermore, an interpretation consistent with the statute's plain meaning is particularly appropriate where, as here, the legislative history provides no support for an alternative reading. The legislative record of the passage of the Uniform Controlled Substances Act is barren of any discussion of the particular provision at issue here. *See* JUDICIARY REPORT, *supra.*

That history reveals, however, that while the Council was aware of the search warrant provision in its entirety, § 33–565, it was manifestly concerned with the retention of the policy permitting liberal nighttime execution of search warrants. As the report on the bill noted:

> [S]ection 501 of the CSA would continue to permit search warrants to be served at any time of day or night. The retention of a provision for nighttime search warrants, now contained in section [ ]14(h) of the UNA, was considered essential by both the *United States Attorney* for the District of Columbia and the *Chief of Police of the Metropolitan Police Department* for the effective enforcement of the drug laws of the District.

JUDICIARY REPORT, *supra,* at 7 (emphasis added). This paragraph constitutes the full legislative record surrounding the search warrant provision. While it would be inappropriate to rely too heavily on this record, it does indicate that the Council specifically relied on recommendations of the United States Attorney and the Chief of the Metropolitan Police Department in considering the enforcement provisions of the CSA. From the Council's failure to mention con-

---

**6.** The search in this case took place sometime in the evening. Appellant was not present, but his young niece was babysitting an eleven month old child. Immediately prior to the officers' entry, the babysitter noticed "a lot of green cars" outside the apartment. She heard a lot of noise and commotion in the building. Although the judge found that the officers announced their presence, both the babysitter and the testifying officer indicated that five or six officers dressed in civilian clothes kicked in appellant's door and knocked a flower pot to the ground. The girl was seated in a chair holding the baby. She was indisputably frightened. She testified without contradiction that one of the officers said, "Freeze or I'll blow your head off." She then stood up, put her hands in the air, and dropped the baby.

**7.** D.C.Code § 23–522(c) (1981) provides:

> The application [for a search warrant] may also contain a request that the search warrant be made executable at any hour of the day or night upon the ground that there is probable cause to believe that (1) it cannot be executed during the hours of daylight, (2) the property sought is likely to be removed or destroyed if not seized forthwith, or (3) the property sought is not likely to be found except at certain times or in certain circumstances. Any request made pursuant to this subsection must be accompanied and supported by allegations of fact supporting such request.

sultation with the Park Police, it is not unreasonable to infer that the Council never considered officers of the federal agency enforcers of local narcotics laws.

Moreover, the legislative history of the predecessors to § 33–565(e) does not support an alternative reading. The special warrant provision traces its origin to Section 14(e) of the Uniform Narcotic Drug Act (UNA), originally enacted in 1938. Pub.L. No. 75–682, ch. 532, 52 Stat. 785 (1938). As enacted in Section 14(e) and codified for years at D.C.Code § 33–414(e), the provision stated:

> If the judge or commissioner is ... satisfied of the existence of the grounds of the application or that there is probable cause to believe their existence, *he must issue a search warrant, signed by him, to the major and superintendent of po-lice of the District of Columbia or any member of the Metropolitan Police Department,* stating the particular grounds or probable cause for its issue.

*Id.* (emphasis added). With the 1981 recodification of the D.C.Code, § 33–414(e) was changed to § 33–514(e) and the words "major and superintendent" were replaced by the word "Chief." The word change reflected the earlier abolition of the Office of the Major and Superintendent of the Metropolitan Police and the transfer of the functions of that office to the Chief of Police. Reorganization Order No. 7, September 16, 1952; Organization Order No. 153, November 10, 1966, 13 D.C.Reg. 114–15 (1966). Except for that ministerial change, D.C. Code § 33–565(e) remains the same as originally enacted in Section 14(e) of the 1938 UNA.[8]

---

**8.** There appears to be some confusion in the case law about the origin of § 33–565. As the government correctly noted in its brief, in *United States v. Alatishe,* 616 F.Supp. 1406, 1411–12 (D.D.C.1985), the District Court erroneously attributes the origin of the warrant provision at § 33–565 to the 1956 Dangerous Drug Control Act. Pub.L. No. 84–764, ch. 676, 70 Stat. 609 (1956). While Title II, Section 210 of the Dangerous Drug Control Act (formerly codified at D.C.Code § 33–609 (1981)) did contain a warrant provision, that provision differed significantly from the one at issue here. The Dangerous Drug Act provision stated in its entirety:

> (a) A search warrant may be issued upon probable cause, supported by affidavit particularly describing the property to be seized and place to be searched, by any judge of the Superior Court of the District of Columbia or by the United States Magistrate for the District of Columbia, to any officer of the Metropolitan Police Department when any dangerous drugs are manufactured, possessed, prescribed, and delivered in violation of the provisions of this chapter, and any such dangerous drugs and any other property designed for use in connection with such unlawful manufacturing, possession, prescribing, or delivery, may be seized thereunder and shall be subject to such disposition as the Court may make thereof, and such dangerous drugs may be taken on the warrant from any house or other place in which they are concealed.
>
> (b) Any search warrant issued in accordance with the provisions of subsection (a) of this section may be served at any time in the day or night and must be executed and returned to the issuing authority within 10 days after its date.

D.C.Code § 33–609 (1981) (repealed).

That significantly less comprehensive provision was affirmatively repealed through § 604(a)(1) of the CSA which section repealed the Dangerous Drug Act in its entirety. By contrast, § 14 of the UNA was not expressly repealed by the CSA, but rather, substantially incorporated verbatim in the CSA. D.C.Law 4–29, § 604(c)(6), 28 D.C.Reg. 3116 (1981). For that reason, the language of § 33–565 tracks almost in its entirety that of Section 14 of the UNA. Indeed, all the legislative history annotations which follow the actual codifications within the D.C.Code accurately attribute the origin of § 33–565 (and its substantially verbatim predecessors § 33–514 and § 33–414) to the 1938 Uniform Narcotic Drug Act. For those reasons, the clear predecessor of the comprehensive scheme of the search warrant provision of the CSA was § 14 of the 1938 UNA.

Additionally, the Supreme Court in *Gooding v. United States, supra,* 416 U.S. 430, 94 S.Ct. 1780, 40 L.Ed.2d 250, erroneously stated that D.C. Code § 33–414 (1973) (the predecessor to § 33–565) was enacted in 1956. *Gooding, supra,* 416 U.S. at 432, 94 S.Ct. at 1782. Again, the comprehensive warrant provision at issue here was originally enacted in 1938 as part of the Uniform Narcotic Drug Act.

The confusion surrounding the origin of D.C. Code § 33–565 (and its predecessors § 33–514 (1981) and § 33–414 (1938–1981)) is probably due to two factors. First, the Dangerous Drug Control Act was enacted in 1956. Pub.L. No. 84–764, ch. 676, 70 Stat. 609 (1956). The bill had three separate titles, only the second of which established altogether new legislation. The first title revised the Act of June 25, 1953, which provided for the treatment of narcotics users in the District. *Id.* at Title I, 70 Stat. at 609–12. The second title was the altogether new legislation, and was entitled the "Dangerous Drug Act." *Id.* at Title II, 70 Stat. at 612–18.

The legislative record of the enactment of the UNA contains no references to Section 14(e). Indeed, the record is barren of any discussion of Section 14, the entire search warrant provision.[9] Significant, however, is the fact that the model "Uniform Narcotic Drug Act," approved by the National Conference of Commissioners on Uniform State Laws in 1932, contained no search warrant provision. *See* Uniform Narcotic Drug Act, 9A U.L.A. 229–577 (1958). It is therefore reasonable to conclude that Congress engrafted onto the UNA the almost identical, comprehensive search warrant provisions found in the Espionage Act of 1917. Espionage Act of 1917, ch. 30, Title XI, §§ 1–23, 40 Stat. 217, 228–30 (1917) (previously codified at 18 U.S.C. §§ 611–633 (1934)). The Espionage Act required magistrates or judges to issue search warrants to a:

civil officer of the United States duly authorized to enforce or assist in enforcing any law thereof, or to a person so duly authorized by the President of the United States.

*Id.* at § 6, 40 Stat. at 229. In incorporating the search warrant provision of the federal Espionage Act to the Uniform Narcotic Drug Act for the District of Columbia, Congress affirmatively changed this language to require issuance to the "major

and superintendent ... or any member of the Metropolitan Police Department." Pub.L. No. 75–682, ch. 532, § 14(e), 52 Stat. 793 (1938). Congress' modification of the language of the Espionage Act evinced a sound, conscious decision to entrust local narcotics law enforcement to local law enforcement officers. While it is perhaps unfair to infer from this modification a *deliberate* intention to exclude Park Police officers from search warrant authority, we need not find such an intention in order to give the statute its plain language interpretation.

To draw any conclusions, therefore, contrary to the plain language of § 33–565(e) in the face of the legislative history, or lack thereof, of the 1981 Uniform Controlled Substances Act and that of the 1938 Uniform Narcotic Drug Act would be incongruous.

The government would have us draw the contrary conclusion. It argues that the Park Police have enjoyed jurisdiction co-extensive with the Metropolitan Police Department since the establishment of the Park Police in 1882. D.C.Code § 4–201 (1981). An interpretation of § 33–565(e) excluding the Park Police would, therefore, "repeal by implication" the earlier, broader grant of authority given the Park Police

---

Thus, the overall "Dangerous Drug Control Act" could easily be confused with its primary but only partial feature which was called the "Dangerous Drug Act." The third title of the overall Act amended the Uniform Narcotic Drug Act. *Id.* at Title III, 70 Stat. 618–22. The search warrant provision, Section 14 of the UNA, remained unchanged with the 1956 amendments except that the provision relating to the night execution of search warrants, Section 14(h) of the UNA, was liberalized. *Id.* at Title III, 70 Stat. at 620. The simultaneous enactment of amendments to the UNA and the new "Dangerous Drug Act" within the same bill entitled the "Dangerous Drug Control Act" undoubtedly created confusion. Of course, the fact that the UNA was amended in some respects in 1956 does not alter the true source of the entire special search warrant provision in the UNA. Moreover, Congress did not amend Section 14(e), at issue here, when it amended the UNA nighttime search provision.

Another possible source of the confusion is Congress' enactment of the "Narcotic Control Act" in 1956 also. Pub.L. No. 84–728, ch. 629,

70 Stat. 567 (1956). However, Congress was acting in its federal capacity in enacting the Narcotic Control Act. The Narcotic Control Act was federal legislation subsequently codified in scattered sections of Title 18 and Title 26 of the United States Code. By contrast, Congress was acting in its capacity as a "local" legislature in approving the Uniform Narcotic Drug Act of 1938. The UNA was subsequently codified in Title 33 of the District of Columbia Code.

9. *See* H.R.REP. No. 2375, 75th Cong., 3d Sess. (1938); S.REP. No. 2032, 75th Cong., 3d Sess. (1938); 83 CONG.REC. 7502–06 (1938) (Committee amendments accepted and bill approved by House); 83 CONG.REC. 8934–38 (1938) (Senate passed bill without debate). In 1936, both the House and Senate had approved a bill to enact the UNA. Congress adjourned, however, before the conference committee could meet to discuss the differing versions. *See* S.REP. No. 1538, 74th Cong., 2d Sess. (1936); H.R.REP. No. 2745, 74th Cong., 2d Sess. (1936); 80 CONG.REC. 2436–39 (1936) (passed by Senate); 80 CONG.REC. 10681–84 (1936) (passed by House).

pursuant to D.C.Code § 4–201.[10] "The argument is interesting but has little force." *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 649 n. 12, 101 S.Ct. 2559, 2564 n. 12, 69 L.Ed.2d 298 (1981).

The premise upon which the argument is based is faulty. The extent of *de facto* authority exercised by the Park Police in 1938 when Section 14(e) of the UNA was enacted is simply unknown. Since Congress affirmatively modified the language of the Espionage Act to include only the Metropolitan Police Department, however, it is reasonable to infer Congress never considered the federal Park Police as agents in local narcotics law enforcement. Furthermore, the District court in *Alatishe, supra* note 8, 616 F.Supp. at 1408, indicated that the Park Police had set up a Narcotics Task Force only two years preceding the 1985 decision. Therefore, contrary to the government's speculation about Park Police authority in 1938, it is more reasonable to conclude that the Park Police had never assumed power to conduct narcotics searches, including nighttime searches of homes, in 1938, and Congress never presumed they had power to do so.

The extent of Park Police *de jure* power to execute narcotics search warrants under § 4–201 was never subject to judicial review at the time. This court's recent decision in *Richardson, supra*, 520 A.2d 692, by no means compels the contrary conclusion. There, we specifically held that pursuant to D.C.Code § 4–201, "United States Park Police officers have jurisdiction to make arrests anywhere in the District of Columbia." *Richardson, supra*, 520 A.2d at 693. Our concern with the Park Police's authority to make arrests outside the national park system and other federal reservations could not have been more apparent.[11] Indeed, since the facts of that case involved the warrantless arrest of an individual on the streets of the District, we had no occasion to address the question of Park Police authority to be issued search warrants pursuant to D.C.Code § 33–565(e) (1986 Supp.).

Finally, the canon of statutory construction the government invites us to apply specifically, and for good reason, disfavors only *repeals* by implication. 1A SUTHERLAND, STATUTORY CONSTRUCTION, § 23.09 at 332 (Sands 4th ed. 1985). Even if we entertain the government's speculative premise of general Park Police authority to conduct searches on an equal footing with the Metropolitan Police Department in 1938, nothing would prevent Congress from merely *limiting* their search authority to non-narcotics cases.

We recognize a conflict between our decision and that of the District Court in *Alatishe, supra* note 8. Presented with the identical question of Park Police authority under D.C.Code § 33–565(e), the District Court reached the opposite conclusion we reach today. To the extent that the *Alatishe* decision relies heavily on a purported statutory history, its persuasive value is limited.[12] To the extent that the *Alatishe*

---

**10.** The original enactment read:

That hereafter all watchmen provided for by the United States Government for service in any of the public squares and reservations in the District of Columbia shall have and perform the same powers and duties as the Metropolitan police of said District.

Act of August 5, 1882, ch. 389, 22 Stat. 219, 243 (codified as amended at D.C.Code § 4–201).

**11.** At several different points in Part I of the opinion, we reiterated in various forms the holding or its basis: "We agree with the trial court that United States Park Police officers have jurisdiction to make arrests anywhere in the District of Columbia," *Richardson, supra*, 520 A.2d at 694; "[o]ur reading of the statutes and legislative history, and our interpretation of Congress' reaction to information placed before

it, lead us to conclude ... that United States Park Police officers are authorized to make arrests anywhere in the District of Columbia," *id.;* "[i]f Park Police officers' arrest powers had already been limited to the parts ..." *id.* at 695; "the Department of the Interior took the position that Park Police officers were authorized to make arrests anywhere in the District," *id.;* "we conclude that Park Police officers have jurisdiction to make arrests anywhere in the District of Columbia," *id.* at 696.

**12.** The District Court erroneously traced the origin of the warrant provision to the 1956 enactment of the Dangerous Drug Control Act. *See* note 8, *supra*. The court argued that the exclusive mention of the Metropolitan Police in the Dangerous Drug Control Act "appears to have constituted an attempt to remedy the then-pre-

opinion relies on other grounds, for all the reasons stated above, we decline to follow it.

Due to the District's unique status as our nation's capital, many autonomous federal police agencies operate within the District alongside the local Metropolitan Police Department. Given the high potential for inefficiency and waste attendant upon overlap and duplication of services, this court must be reluctant to extend law enforcement jurisdiction beyond the clear statutory authorization set forth by Congress and the Council.[13] We hold, therefore, that under § 33–565(e), the United States Park Police lack statutory authority to be issued search warrants.[14]

## II.

Having agreed with the trial court that the Park Police cannot properly be issued search warrants under § 33–565(e), we turn now to the appropriateness of suppression as a remedy. We reject the government's argument that the violation of a statutory rule does not permit suppres-

sion of evidence. *Schram v. District of Columbia,* 485 A.2d 623 (D.C.1984); *District of Columbia v. Perry,* 215 A.2d 845 (D.C.1966); *see Miller, supra,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332; *Accarino v. United States,* 85 U.S.App.D.C. 394, 179 F.2d 456 (1949). We find, however, that the rule first announced in *Leon, supra,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677, and later amplified in *Krull, supra,* 107 S.Ct. 1160, compels that we reverse and remand for an evidentiary hearing on the question of whether the officers' reliance on the search warrant was "objectively reasonable."

■ We note preliminarily that whether the "good faith" exception to the exclusionary rule applies in any given situation is a mixed question of law and fact to be given de novo review. *United States v. Hendricks,* 743 F.2d 653, 656 (9th Cir.1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 382 (1985), *cited in United States v. Freitas,* 800 F.2d 1451, 1454 (9th Cir.1986); *see United States v. Accardo,* 749 F.2d 1477, 1481 (11th Cir.), *cert. de-*

---

vailing practice that all warrants had to be executed by federal officers." *Alatishe, supra* note 8, 616 F.Supp. at 1411. But not all warrants had to be executed by federal officers at that time. Officers of the Metropolitan Police Department were certainly empowered to execute warrants for violations of local narcotics laws under the UNA. The selection from the House report that *Alatishe* cites to was labelled: "Police officers are not authorized to serve search warrants for violations of *Federal* narcotic laws." H.R.Rep. No. 2277, 84th Cong., 2d Sess. 15 (1956) (emphasis added). Therefore, while it was true that in 1956 officers of the Metropolitan Police Department could not execute warrants for violations of federal laws, it is also irrelevant. Congress' 1956 determination to *expand* the search authority of the Metropolitan Police to include jurisdiction under both local and federal law obviously did not address the question of the search authority of the United States Park Police under local law. Moreover, the court in *Alatishe* appeared to rely heavily on the fact that the legislative history did not indicate Congress' affirmative intention to limit search authority to the Metropolitan Police. *Alatishe, supra* note 8, 616 F.Supp. at 1411–12. As we indicated above, given the statutory history and the plain language, we find it unnecessary to glean from the history an affirmative intention to exclude the Park Police. *Ante* at 781.

13. In *Alatishe, supra* note 8, 616 F.Supp. at 1408, the court noted that unbeknownst to the Metropolitan Police, the recently-established Narcotics

Task Force of the Park Police appeared to be investigating the same defendants as the Metropolitan Police Department. Consequently, the Metropolitan Police were "somewhat surprised to discover that the Park Police has conducted a drug raid." *Id.* This court cannot sanction that type of overlap, duplication, and possible inefficiency without clear legislative approval.

14. As for the execution of narcotics search warrants, D.C. Code § 33–565(f) provides:

A search warrant may in all cases be served by any of the officers mentioned in its direction, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution.

Where the officers named in the direction lack authority to be issued a search warrant, this provision does not provide an alternative substantive basis for their execution of the warrant. *See United States v. Martin,* 600 F.2d 1175, 1181 (5th Cir.1979) (corollary language at 18 U.S.C. § 3105 (1982) "does not confer any substantive authority to execute a search warrant, but was meant to enlarge the common law rule which required that a search warrant be directed only to a particular person and be executed only by that person"); *United States v. Sigal,* 341 F.2d 837, 843 (3d Cir.) (and cases cited), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

nied, *Pinckard v. United States*, 474 U.S. 949, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985). The Supreme Court has defined "mixed" questions as those in which "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790 n. 19, 72 L.Ed.2d 66 (1982). Of course, the trial court's preliminary determination of the historical facts surrounding the issuance of the warrant is subject to review on a "clearly erroneous" standard. Whether those facts satisfy the requirements of the good faith exception, however, is reviewed de novo by this court. *See Freitas, supra*, 800 F.2d at 1454.

In its landmark *Leon* decision, the Supreme Court announced what is commonly referred to as the "good faith" exception to the suppression of illegally obtained evidence.[15] The court held that the exclusionary rule does not bar "the use in the prosecution's case-in-chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *Leon, supra*, 468 U.S. at 900, 104 S.Ct. at 3409. In the companion case to *Leon*, exclusion was found inappropriate for items seized "pursuant to a warrant subsequently invalidated because of a technical error on the part of the issuing judge." *Massachusetts v. Sheppard*, 468 U.S. 981, 984, 104 S.Ct. 3424, 3425, 82 L.Ed.2d 737 (1984) (issuing judge inadvertently failed to correct clerical error on face of warrant). The rationale underlying the court's rulings was the perceived view that when a magistrate intervenes to authorize a search, the minimal deterrent effect achieved by suppression does not justify the substantial cost involved in excluding reliable evidence from the truth-finding process.

The Supreme Court reasoned that deterrence of police misconduct was the primary purpose of the exclusionary rule. *Leon, supra*, 468 U.S. at 916, 104 S.Ct. at 3417. In the court's view, exclusion was generally inappropriate when an officer acting in good faith obtains a search warrant from a judge or magistrate and acts within the scope of the warrant. "In most such cases, there is no police illegality and thus nothing to deter." *Id.* at 920–21, 104 S.Ct. at 3419.

The unavailability of suppression as a remedy was premised on the fact of intervention by a judge or magistrate. The court found no evidence suggesting that judges and magistrates appeared to ignore or subvert Fourth Amendment doctrine. "[W]e discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate." *Id.* at 916, 104 S.Ct. at 3417. Therefore, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 921, 104 S.Ct. at 3419 (footnote omitted).

The Supreme Court has recently reiterated that a key requirement triggering the application of the rule of nonexclusion is the intervention by a neutral, third party in the determination of the issue ultimately found to be wrongly decided: "the question whether the exclusionary rule is applicable in a particular context depends significantly upon the actors who are making the relevant decision that the rule is designed to influence." *Krull, supra*, 107 S.Ct. at 1173 n. 71. In *Krull*, the court rejected

---

**15.** As at least one other court has noted, the term "good faith" exception was "typically used to describe the proposed rule before it was recognized in *Leon*," and does not fully capture the nature of the inquiry which must be undertaken. *United States v. Savoca*, 761 F.2d 292, 294 n. 1 (6th Cir.1985) (citations omitted). Not only does the terminology distort the Supreme Court's emphasis on "objectively reasonable reliance," but it also ignores the fact that under certain circumstances "good faith" may be irrelevant to the inquiry. *See Krull, supra*, 107 S.Ct. at 1173 n. 17. The rule which the Supreme Court first announced in *Leon* and recently amplified in *Krull* will at times be referred to here as the rule of nonexclusion. When the requirements of the rule are met, the case-in-chief exclusion of evidence is an inappropriate remedy for constitutional or statutory violations.

suppression where an officer reasonably relied on a statute authorizing warrantless administrative searches even though the statute was ultimately found unconstitutional. The Court determined that "legislators, like judicial officers, are not the focus of the rule." *Id.* at 1167. An officer "cannot be expected to question the judgment of the legislature that passed the law," and make an independent determination of the law's constitutionality. *Id.* The Court's requirement of the intervention of a neutral party reflects its underlying policy determination that deterrence of police misconduct will not be effectuated where police rely on the decision of another. Reliance is thus an essential element in rejecting the exclusionary rule.

Explicit in *Leon,* however, is the view that not every act of reliance on the intervention of a judge or magistrate will automatically eliminate exclusion as the appropriate remedy for constitutional or statutory violations. Thus, if the warrant is "facially deficient," for example, in failing to particularize the place to be searched or the things to be seized, suppression is still appropriate despite a magistrate's stamp of approval. *Leon, supra,* 468 U.S. at 923, 104 S.Ct. at 3421. Or, if the warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," suppression is available. *Id.* (citing *Brown*

*v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)). Also, if a magistrate abandons his neutral and detached role, good faith reliance on the warrant will not prevent suppression. *Leon, supra,* 468 U.S. at 923, 104 S.Ct. at 3421 (citing *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979)). Furthermore, "if the magistrate or judge in issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his disregard of the truth," suppression is appropriate. *Leon, supra,* 468 U.S. at 923, 104 S.Ct. at 3421 (citing *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). And finally, if "it is plainly evident that a magistrate or judge had no business issuing a warrant," the exclusionary rule will still be applicable. *Massachusetts v. Sheppard, supra,* 468 U.S. at 990 n. 7, 104 S.Ct. at 3429 n. 7 (quoting *Illinois v. Gates,* 462 U.S. 213, 264, 103 S.Ct. 2317, 2346, 76 L.Ed.2d 527 (1983) (White, J., concurring in judgment)).[16]

Indeed, *Leon, Sheppard,* and *Krull* enunciate the principle that an officer's reliance on either a warrant or a statute must be "objectively reasonable." *Leon, supra,* 468 U.S. at 919 n. 20, 104 S.Ct. at 3419, n. 20; *Sheppard, supra,* 468 U.S. at 990, 104 S.Ct. at 3429; *Krull, supra,* 107 S.Ct. at

---

**16.** In *Krull,* the Court makes it clear that *Leon's* list of possible scenarios in which suppression remains an appropriate remedy is not exhaustive nor exclusive. There, the Court determined that the defect in the statute—its failure to circumscribe officers' discretion in conducting searches—"was not sufficiently obvious so as to render a police officer's reliance upon the statute objectively unreasonable." *Krull, supra,* 107 S.Ct. at 1172. While the court upheld objectively reasonable reliance on a statute which had not been subject to judicial review at the time of the search, the court specifically limited its holding of non-exclusion to the items seized pursuant to the legislature's authorization. The Court reserved for a different time the question whether suppression is appropriate when an officer acts outside the scope of the authority granted by the legislature without seeking judicial approval of the action:

At this juncture, we decline the State's invitation to recognize an exception [to exclusion] for an officer who erroneously, *but in good*

*faith,* believes he is acting within the scope of a statute. Not only would such a ruling be premature, but it does not follow inexorably from today's decision. As our opinion makes clear, the question whether the exclusionary rule is applicable in a particular context depends significantly upon the actors who are making the relevant decision that the rule is designed to influence. *The answer to this question might well be different when police officers act outside the scope of a statute, albeit in good faith.* In that context, the relevant actors are not legislators or magistrates, but police officers who concededly are 'engaged in the often competitive enterprise of ferreting out crime.'

*Id.* at 1173 n. 17 (emphasis added) (citations omitted). Thus, *Krull* leaves open questions with respect to the appropriateness of suppression even in some circumstances of objective good faith and makes clear that the applicability of the exclusionary rule must be decided on case-by-case basis.

1170. In *Leon,* the Court stated: "We emphasize that the standard of reasonableness we adopt is an objective one." *Leon, supra,* 468 U.S. at 919 n. 20, 104 S.Ct. at 3419 n. 20.

Objective reasonableness in this context implies a more stringent standard than subjective good faith. Of course, if the constitutional or statutory violation is intentional, knowing, or consciously indifferent to (or in reckless disregard of) compliance with the constitutional or statutory mandate, the "objective reasonableness" standard is clearly not met. In addition, however, the objective standard "requires officers to have a reasonable knowledge of what the law prohibits," and to conform their action to an objective standard. *Id.* at 920 n. 20, 104 S.Ct. at 3419 n. 20.

■ The "objectively reasonable" standard announced in *Leon* and applied in *Krull* was based on underlying constitutional deficiencies in a warrant and a statute. In light of the rationale underlying the Supreme Court's choice of an objective standard, however, we find it appropriate to apply that standard in cases of statutory violations also. Quoting Professor Jerold Israel, the Supreme Court noted:

> The key to the [exclusionary] rule's effectiveness as a deterrent lies ... in the impetus it has provided to police training programs that make officers aware of the limits imposed by the fourth amendment and emphasize the need to operate within those limits. [An objective good-faith exception] ... is not likely to result in the elimination of such programs, which are now viewed as an important aspect of police professionalism.

*Leon, supra,* 468 U.S. at 919 n. 20, 104 S.Ct. at 3419 n. 20 (quoting Y. KAMISAR, W. LaFAVE & J. ISRAEL, MODERN CRIMINAL PROCEDURE, 1412–13 (5th ed. 1980) (bracketed material appearing in *Leon* ). Emphasis in police training programs on statutory, procedural, and jurisdictional limitations, and the need to "operate within those limits," should likewise be an important function of police training. Erosion of an impetus for training, through lowering the standard of reliance and behavior, is not called for.

Thus, we decline to follow such cases as *United States v. Comstock,* 805 F.2d 1194 (5th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1908, 95 L.Ed.2d 513 (1987), and *State v. Matthieu,* 506 So.2d 1209 (La. 1987), which apply a lower standard for statutory violations.

Applying the principles of non-exclusion to this case, we note that here, as in *Leon,* a neutral judge was the "relevant actor" who intervened in the investigatory process and approved the warrant and its direction to the "Chief, United States Park Police or any other law enforcement officer." A question exists, however, as to whether the officers' reliance on the warrant was "objectively reasonable." In this regard, the following colloquy at the suppression hearing raises substantial questions about the reasonableness of the Park Police's assertion of authority:

> Prosecutor: Okay, and have you previously been involved in obtaining and executing search warrants for a premises in the District of Columbia?
>
> Officer: Many.
>
> Prosecutor: And was your authority to do so as a member of the Park Police ever challenged?
>
> Defense: Objection, that's a legal issue.
>
> The Court: Well, no the question's all right; I think it's beyond what we need to have for this purpose—
>
> Prosecutor: Okay.
>
> The Court: —because it's not going to make a difference, Ms. [Prosecutor]—if everybody is doing it wrong it's not going to change this case but he can answer the question if he wants to.
>
> Officer: Yes, it has.
>
> Prosecutor: Excuse me?
>
> Officer: Yes, it has been challenged.

The prosecutor changed the line of questioning.

This record does not indicate whether the so-called challenge to authority came prior to the issuance of the warrant, during the six months between the time of the issuance of the warrant (February, 1985) and the decision in *Alatishe* (August, 1985), or

after *Alatishe.*[17] Nor does the record indicate from what source the challenge emanated. Obviously, if a veteran police officer is aware of a challenge to his authority to secure a warrant from the Superior Court and nevertheless seeks to secure such a warrant, a substantial question is raised as to whether reliance on that warrant is objectively reasonable. *See Leon, supra,* 468 U.S. at 920 n. 20, 104 S.Ct. at 3419 n. 20 (quoting ISRAEL, *supra,* at 1412–13) ("the requirement that the officer act in 'good faith' is inconsistent with closing one's mind to the possibility of illegality").

We therefore reverse and remand with directions that a hearing be held to determine whether the Park Police officer or officers seeking the narcotics warrant in the Superior Court were aware of challenges to their authority to engage in local narcotics searches prior to February 20, 1985 (the date on which the warrant was sought). The motions court is also directed to take evidence on any other matters he determines relevant to the "objective reasonableness" of the Park Police reliance. At a minimum, however, if at the time of the issuance of the warrant, the officer seeking the warrant (or an officer accompanying that officer) knew that Park Police authority to engage in searches of private homes was subject to reasonable doubt, and if he nevertheless failed to bring that question before the issuing judge, then the motions court should reinstate its order granting appellee's motion to suppress.[18] A contrary result would be tantamount to sanctioning the practice of failing to present to a magistrate or judge all the

relevant issues surrounding the issuance of a warrant. *Cf. Comstock, supra,* 805 F.2d at 1210 ("we do not countenance conscious indifference or reckless disregard").

We note that any reliance on warrants issued to the Park Police pursuant to D.C.Code § 33–565(e) (1986 Supp.) subsequent to the date of this decision will not be "objectively reasonable." This decision constitutes sufficient notice of a deficiency in statutory authority to require that knowledge of this deficiency be imputed to officers seeking a warrant.[19] A contrary conclusion would effectively eliminate almost any possibility for deterrence of police misconduct.

For the reasons stated, the order appealed from, to the extent it concluded that the Park Police lacked statutory authority to be issued search warrants under D.C.Code § 33–565(e) (1986 Supp.), is affirmed. The order of suppression is vacated and the case is remanded for further proceedings consistent with this decision.

*So ordered.*

---

17. It must be remembered that Park Police reliance on the decision in *Alatishe* was not possible since the decision was rendered some six months after the application for, and issuance of, the warrant in this case.

18. As in *Leon,* references throughout this opinion to "officer" should not be read too narrowly. *Leon, supra,* 468 U.S. at 923 n. 24, 104 S.Ct. at 3420 n. 24. In *Leon,* it was "necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination." *Id.* Likewise, here, a broader scope of inquiry may be neces-

sary to determine the objective reasonableness of the unilateral assumption of Park Police authority to search and the consequent reliance on the issuing judge's warrant.

19. Furthermore, we take this opportunity to apprise Superior Court judges and commissioners that given the plain language of D.C.Code § 33–565(e) (1986 Supp.), it is now "plainly evident," *see Massachusetts v. Sheppard, supra,* 468 U.S. at 990 n. 7, 104 S.Ct. at 3429 n. 7; *Illinois v. Gates, supra,* 462 U.S. at 264, 103 S.Ct. at 2346 (White, J., concurring in judgment), that narcotics search warrants should not be issued to Park Police officers under § 33–565(e) in the absence of a change in the statutory language.